**SIGNED THIS: May 16, 2011**

_____
                   **THOMAS L. PERKINS
   UNITED STATES CHIEF BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: ) | |
| ) | |
| PIERCE DEVELOPMENT CORPORATION, ) | No. 09-83398 |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| CHARLES E. COVEY, Trustee, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Adv. No. 10-8088 |
| ) | |
| NASH CRANE SERVICE, INC., ) | |
| ) | |
| Defendant. ) | |

### O P I N I O N

This matter is before the Court after trial on the complaint filed by the Trustee, Charles E. Covey (TRUSTEE), against Nash Crane Service, Inc. (NASH), to avoid and recover as preferences two payments received by NASH from the Debtor, Pierce Development Corporation (DEBTOR).

The facts are largely undisputed. NASH concedes the TRUSTEE'S *prima facie* preference case admitting that each of the five elements of section 547(b) are established. The sole issue is whether NASH has carried its burden to prove that the payments are shielded by the ordinary course defense of section 547(c)(2)(A), which protects an otherwise avoidable transfer from avoidance if:

> (1)  the transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and
>
> (2)  the transfer was made in the ordinary course of business or financial affairs of the debtor and the transferee.

11 U.S.C. § 547(c)(2)(A). The TRUSTEE concedes the first element of the defense, that the debt was ordinary, so the only issue is whether the payments were ordinary between the parties.

The DEBTOR sold modular homes in Central Illinois for several years until it closed down and filed a Chapter 7 petition on October 16, 2009. NASH owns and operates cranes and subcontracts its services on commercial and residential construction projects. NASH acted as a regular subcontractor to the DEBTOR from 2006 through September, 2009.

Modular homes are assembled at the manufacturing plant and trucked to the purchaser's building lot after the foundation, either a slab or a basement, has been poured. A crane is required to lift the home off the flatbed trailer and place it on the foundation. In the industry lingo, that process is called a "Set." NASH charged the DEBTOR anywhere from $1,300 to $4,900 per Set for each of the 28 Sets it performed for the DEBTOR during the four years it was employed.

NASH worked on credit, invoicing the DEBTOR on "net 30" terms, meaning the full amount was due within 30 days without any discount for quicker payment. The invoices provided for an interest charge on past due amounts, but NASH never assessed interest or any late fees even though the DEBTOR regularly paid late.

The two challenged payments total $5,745. The first arises from an invoice dated December 2, 2008, in the amount of $2,860 which the DEBTOR paid 282 days later on September 10, 2009. The second arises from an invoice dated February 5, 2009, in the amount of $2,885 which the DEBTOR paid 217 days later, also on September 10, 2009. All of the 26 other payments were paid between 17 and 203 days after the invoice date, with the ten latest ones, in declining order, being 203, 165, 153, 133, 129, 117, 109, 105, 105 and 103 days after the invoice date. The issue is whether the last two payments, paid very late and more late than any prior payment, are nevertheless protected as ordinary course payments.

Section 547(c)(2) was materially amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Prior thereto, in addition to proving that the debt had been incurred in the ordinary course of business, the creditor had to prove that the payment was both subjectively ordinary – ordinary between the parties, and objectively ordinary – ordinary in the industry. For cases filed on or after BAPCPA's effective date of October 17, 2005, a creditor must still prove that the debt was incurred in the ordinary course of business, but in addition need only prove either that the payment was subjectively or objectively ordinary. *See In re Rocor Intern., Inc.*, 352 B.R. 319, 333 n.7 (Bankr.W.D.Okla 2006). In this case, NASH has limited its defense to the subjective prong

3

only. Thus, the sole issue to be resolved is whether the challenged payments were made in the ordinary course of business or financial affairs of the DEBTOR and NASH.

Where, as here, there is a history of similar transactions and payments between a debtor and creditor, the initial focus of the inquiry is on the timing of the payments. Late payments may be subjectively ordinary if the parties had a history of making and accepting late payments. *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir. 1993). Other facts may be relevant, such as whether the creditor engaged in unusual collection activity or whether the method of payment changed during the preference period. But unless the late payments are first shown to be ordinary on the basis of their timing or "lateness," the defense will fail and it will be unnecessary to consider other facts. The converse is also true that payments that are not subjectively ordinary because they are simply too late, may not otherwise be protected by proof that they were not accompanied by unusual collection activity or a change in terms or method of payment.

To demonstrate that alleged preferential payments were subjectively ordinary, the creditor must demonstrate that the payments were ordinary in relation to its past practices with the debtor, first by establishing a baseline of past practices and next by showing that the challenged payments were ordinary in relation to the baseline. *In re Healthcentral.com*, 504 F.3d 775, 790 (9th Cir. 2007). How late do payments have to be in order to be too late? If the debtor had a history of making timely payments to the creditor, any amount of lateness would render a payment non-ordinary. *Tolona Pizza,* 3 F.3d at 1032. But where the payment history shows a regular pattern of late payments, lateness must be measured against that historical pattern: "the norm established by the debtor and the creditor in the

4

period before, preferably well before, the preference period." *Id.* If the challenged payments are outside of the normal pre-preference period range, they are not subjectively ordinary even if there is nothing unusual about any other aspect of the debtor-creditor relationship. *See In re AppOnline.com, Inc.,* 315 B.R. 259, 284 (Bankr.E.D.N.Y. 2004) (lateness is "particularly relevant" in determining whether payments should be protected by the ordinary course of business exception).

The two challenged payments are more late than any of the 26 previous ones. The latest of the two, paid 282 days after invoice, is 79 days later than the latest payment of 203 days made during the pre-preference period. Lateness alone renders that payment non-ordinary. The other challenged payment, paid 217 days after invoice, is 14 days later than, but within 10% of, the next latest payment of 203 days. *See In re H.L. Hansen Lumber Co. of Galesburg, Inc.,* 270 B.R. 273, 279 (Bankr.C.D.Ill. 2001) (expanding the outer limit of the baseline by 10%). So the question is closer.[1] What tips the scales in favor of the TRUSTEE is the unusual collection activity that prompted the September 10, 2009, payments. Specifically, the payments occurred after NASH began filing mechanics lien claims, sending attorney demand letters, threatening to perform no further Sets unless all invoices were paid, and demanding an additional $500 from the DEBTOR per Set to be applied to unpaid invoices. When that unusual collection activity is considered in conjunction with the lateness of the 217-day payment, its non-ordinariness is apparent.

---

[1] The Court is not holding that the baseline is always (or ever) determined by the latest of the pre-preference period payments. The TRUSTEE, with good cause, argues that the payment made 203 days late is an outlier that should be disregarded. The challenged payment made 217 days after its invoice is held to be avoidable even if the baseline is set at 203 days plus 10%, which is the baseline most favorable to NASH under the facts of the case.

NASH contends that its relationship with the DEBTOR was "unusual" from day one, that the DEBTOR was insolvent from the beginning and was always relying on new jobs to pay old bills, the payments were almost all late and unpaid invoices were a constant source of irritation and concern for NASH. NASH argues that nothing about the relationship was ever really "ordinary." In light of *Tolona Pizza*, it is difficult to give this argument any credence, as it suggests that the baseline analysis as the standard for comparison may be disregarded if circumstances are extreme enough. This argument boils down, in effect, to the proposition that if a creditor proves its relationship with the debtor is entirely abnormal, then anything goes. The argument fails to appreciate, however, that it is the creditor's burden to prove the challenged payments are ordinary; the burden is not on the trustee to prove that the payments are extraordinary.

The cases cited by NASH are not persuasive. *In re Archway Cookies*, 435 B.R. 234 (Bankr.D.Del. 2010), is cited for the proposition that the ordinary course exception should be liberally construed in favor of creditors so as not to unduly punish creditors who work with struggling debtors and so give them "a fighting chance of sidestepping bankruptcy and continuing in business." 435 B.R. at 241. In *In re Elrod Holdings Corp.*, 426 B.R. 106 (Bankr.D.Del. 2010), the court held that the creditor's threats to withhold shipments were not enough to render the challenged payments non-ordinary, where the timing of the payments was within the pre-preference period range. *In re Big Wheel Holding Co., Inc.*, 223 B.R. 669 (Bankr.D.Del. 1998), stands for the proposition that late payments may be subjectively ordinary if consistent with the parties' historical payment pattern, and that a preference payment change in the method or manner of payment does not necessarily

6

render the payments non-ordinary.

None of these cases support a different conclusion here, where the Court applies the principles set forth by the Seventh Circuit in *Tolona Pizza*. NASH established that it continued to work with the DEBTOR for a substantial period of time despite not getting paid on a timely basis. It did its part to help keep a struggling business going. NASH cannot be faulted for that. While it may seem unfair to NASH to now have to return two payments after it already suffered a long delay in receiving them, fairness is not a consideration. *In re Vission, Inc.*, 400 B.R. 215, 221 (Bankr.E.D.Wis. 2008) (fairness defenses to preference actions are not recognized by courts). Individual "unfairness" is tolerated in furtherance of the broad and fundamental policy of equality of distribution among similarly situated creditors. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. *Union Bank v. Wolas,* 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

NASH failed to prove that the two challenged payments were subjectively ordinary within the defense provided by section 547(c)(2)(A). The payments are thus avoidable by the TRUSTEE. The TRUSTEE also seeks prejudgment interest, which he is entitled to recover in the amount of $143.23.[2]

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

---

[2] Based upon the prime rate of 3.25% from August 6, 2010, to the date of judgment. *See Matter of Oil Spill by Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir. 1992).

###